IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FRIENDS OF ANIMALS, and            Case No. 6:14-cv-01449-AA
PREDATOR DEFENSE,                             OPINION AND ORDER

        Plaintiffs,

    v.

U.S. FISH AND WILDLIFE
SERVICE,

        Defendant,

---

Jennifer Barnes
Michael Ray Harris
Friends of Animals
Western Region Office
7500 E. Arapahoe Road, Suite 385
Denver, Colorado 80112

David A. Bahr
Bahr Law Offices
1035 1/2 Monroe Street
Eugene, Oregon 97402
    Attorneys for plaintiffs

Billy J. Williams
Coby Healy Howell
U.S. Department of Justice
Environment and Natural Resources Division
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204
    Attorneys for defendant

Page 1 - OPINION AND ORDER

AIKEN, Chief Judge:

Plaintiffs Friends of Animals and Predator Defense move for summary judgment pursuant to Fed. R. Civ. P. 56. Defendant U.S. Fish and Wildlife Service ("FWS") filed a cross-motion for summary judgment. For the reasons set forth below, plaintiffs' motion is denied and FWS' motion is granted. This case is dismissed.

## BACKGROUND

This case surrounds a conflict of two species - the northern spotted owl ("NSO") and the barred owl and, by extension, FWS' decision to issue a permit under the Migratory Bird Treaty Act ("MBTA") authorizing the take of approximately 3,600 barred owls, over a four year period and within a confined geographical region, to address declining NSO populations.

NSOs are secretive, mostly nocturnal, monogamous, long-lived, and tend to mate for life; however, pairs usually do not nest every year and nesting pairs are not successful every year. 55 Fed. Reg. 26,114 (June 26, 1990). Although the present range of the NSO spans from southwestern British Columbia through the coastal range of northwestern California, the majority of the current population is found in the old-growth and mature forest habitats of the Oregon Cascades and the Klamath Mountains in southwestern Oregon and northwestern California. Id. at 26,114-15.

The barred owl, while native to eastern North America, expanded its range to western North America over the past century. Administrative Record ("AR") 34764. In other words, the range of the barred owl now completely overlaps that of the NSO; due to a

dramatic increase in the number of barred owls over the past few decades, they regularly outnumber NSOs in shared habitat. AR 00013, 00119, 34764-65. The diets of these two species also overlap, by as much as 76% in some regions, but barred owls are "able to eat a much wider variety of food than spotted owls." AR 00135, 34764-65. While, similar to NSOs, barred owls prefer old-growth forest and older forest habitat, they are generally far more adaptable. AR 34764-65. Barred owls have an aggressive nature and have been known to attack NSOs. 55 Fed. Reg. at 26,191; AR 34764. Because the barred owl competes with the NSO for the same habitat and food, the NSO is typically forced out of such shared habitat resulting in decreased survival. AR 00013, 00119, 00135.

The NSO was listed as "threatened" under the Environmental Species Act ("ESA") in 1990. 55 Fed. Reg. at 26,114. As such, FWS was required to develop a recovery plan geared towards improving NSO conservation and survival. 16 U.S.C. § 1533(f). An initial plan was drafted in 1992, amended in 2008,[1] and ultimately superceded in by the current version in 2011 ("2011 Recovery Plan"). AR 34624-900. Along with past and current habitat degradation due to timber harvest and natural catastrophic events, the 2011 Recovery Plan identified increased competition from barred owls as one of the three primary threats to the NSO and required immediate consideration, as information garnered since the 1990 listing revealed that barred owls posed a significant and immediate danger

---

[1] Both the 2008 and 2011 plans retained the same language relative to the barred owl threat. AR 34642, 34704.

to the NSO throughout its range. AR 34648, 34704, 34724, 34764-66; 55 Fed. Reg. at 26,173.

Ultimately, FWS identified 33 specific Recovery Actions in the 2011 Recovery Plan. AR 34635. One of these, Recovery Action 29, involved the design and implementation of "large-scale control experiments to assess the effects of barred owl removal on Spotted Owl site occupancy, reproduction, and survival." AR 34727. The 2011 Recovery Plan recognized the rapid and severe threat from barred owls on NSOs and therefore recommended that Recovery Action 29 be initiated as soon as possible in the form of well-designed removal experiments. Id. According to FWS, these experiments "have the potential to substantially expand [the agency's] knowledge of the ecological interactions between spotted owls and barred owls," and would be designed to provide the "most useful scientific information." Id.

Due to the potentially controversial nature of Recovery Action 29, FWS convened a stakeholder group and employed a bio-ethicist to inform the process of developing the removal study proposal. AR 00737, 01047. Individuals were invited to share their respective views on FWS' proposal and FWS provided educational meetings to explore relevant possibilities. Id. In December 2009, FWS published notice to prepare an environmental impact statement ("EIS") to explore various alternatives and identify significant issues. AR 00738. The public comment period ran until January 2010; "a total of 54 written comment letters, memos, and emails from 54 individual submitters" were received. AR 00738, 01049. In addition, FWS

conducted several meetings, conference calls, and discussions with other federal agencies that would be involved in the proposed study. Id. Information gleaned from this process was then used to formulate a draft EIS. AR 00715-17.

In July 2013, FWS issued the final EIS. AR 00096-600. It evaluated certain cumulative impacts, as well as nine different alternatives, which primarily varied by experimental methods, including the number and distribution of study areas, the type of study, and the method of removal. AR 00125-26, 00143-79, 00372. Because the population of barred owls is robust, FWS concluded that the study would not affect the viability of this species. AR 00129-30, 00257-75. FWS also found that, without continued management, which was not reasonably foreseeable, barred owls would recover to pre-removal study numbers within three to five years after the study was complete. AR 00138, 00372.

The final EIS similarly examined the effects of this removal study on NSOs. AR 00131. On-going demographic studies demonstrated a 2.9% decline in NSO populations per year since 1990. AR 00276. Moreover, the proportion of NSO sites occupied by barred owls in some study areas increased from less than 5% in 1990 to 70% in 2008, and the rate of recruitment of new NSOs into these areas was negatively correlated with the presence of barred owls. AR 00277. FWS hypothesized that NSO site occupancy, survival, and reproduction would likely increase on the treatment areas following barred owl removal, resulting in beneficial effects to this threatened species for the duration of the study. AR 00281.

Page 5 - OPINION AND ORDER

In September 2013, FWS issued its record of decision ("ROD") regarding the selected preferred alternative, explaining that "it would provide for a strong, scientifically-credible experiment with a high power to detect the effect of the barred owl removal on spotted owl populations, and provide results across the range of the spotted owl in a timely manner," especially in light of the fact that the effect of proposed action on the barred owl population would be "negligible." AR 00012-24. The Forest Service and the National Park Service ultimately supported the removal study. AR 02787, 14414, 14454.

Based on the final EIS and ROD, FWS submitted an application for a scientific collecting permit to authorize the lethal and non-lethal take of barred owls under the MBTA. AR 00018, 01395-1422. This application included a detailed explanation of the study design, as well as an explanation of the removal methodologies. Id. In September 2013, FWS determined that the application met the regulatory criteria and issued a permit for the take of up to 2,500 barred owls for the first three years of the study period. AR 00001-08.

Plaintiffs subsequently filed a complaint in the U.S. District Court for the Eastern District of California, which was dismissed in August 2014 for lack of standing. See generally Friends of Animals v. Jewell, 2014 WL 3837233 (E.D.Cal. Aug. 1, 2014). Later that same month, FWS sought to amend its take permit. AR 35797. Specifically, due to funding issues, which caused a delay in initiating removal efforts in other study areas, FWS anticipated

Page 6 - OPINION AND ORDER

that substantially fewer barred owls would be taken during the remaining two years of the permit period and thus sought modification. Id. FWS again went through each of the regulatory criteria and made findings to evaluate whether the new application was consistent with its permitting regulation. AR 35780-83. It also found that this amendment did not trigger the obligation to conduct a supplemental analysis pursuant to the National Environmental Policy Act ("NEPA") and/or reinitiate its consultation duties under the ESA. AR 35784-85. Accordingly, FWS issued an amended permit authorizing the take of 1,600 barred owls. AR 25788-91.

In September 2014, plaintiffs commenced the present lawsuit, asserting that FWS' permit violated NEPA and the MBTA. In February 2015, plaintiffs moved for summary judgment. In April 2015, FWS filed a cross-motion for summary judgment.

**STANDARD**

A federal agency's compliance with NEPA and the MBTA is reviewed under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. In an APA case, summary judgment is awarded in favor of the plaintiff if, after reviewing the administrative record, the court determines that the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Natural Res. Def. Council v. Nat'l Marine Fisheries Serv., 421 F.3d 872, 877 (9th Cir. 2005) (citation and internal quotations omitted). A decision is not arbitrary or capricious if the agency articulated a rational connection between the facts found and the choice made. Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 384

F.3d 1163, 1170 (9th Cir. 2004); see also Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) (en banc), overruled on other grounds by Am. Trucking Ass'ns Inc. v. City of L.A., 559 F.3d 1046 (9th Cir. 2009) (the court "will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

Review under this standard is narrow and the court may not substitute its judgment for that of the agency. Lands Council, 537 F.3d at 987. Nevertheless, while this standard is deferential, the court must "engage in a substantial inquiry, . . . a thorough, probing, in-depth review." Native Ecosys. Council v. U.S. Forest Serv., 418 F.3d 953, 960 (9th Cir. 2005) (citation and internal quotations omitted).

## DISCUSSION

This case hinges on whether FWS adequately complied with the NEPA process and whether the proposed action falls within the purview of the MBTA.

I.   NEPA Claims

NEPA is "a procedural statute that does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." Sierra Club v. Bosworth, 510 F.3d 1016, 1018

(9th Cir. 2007) (citation and internal quotations omitted); 40 C.F.R. §§ 1502.1, 1502.2. NEPA's purpose is realized not through substantive mandates but through the creation of a democratic decision-making structure. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989); see also Barnes v. U.S. Dep't of Transp., 655 F.3d 1124, 1131 (9th Cir. 2011) (NEPA exists "to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action").

Plaintiffs contend that FWS violated NEPA in two respects. First, they contend that "FWS defined the purpose and the need of the proposed action in unreasonably narrow terms." Pls.' Mem. in Supp. of Mot. Summ. J. 24. Specifically, plaintiffs maintain that it was improper "for FWS to develop an entire [final] EIS and ROD to implement only one Recovery Action" because the 2011 Recovery Plan "identified multiple strategies for NSO recovery" and "actually identified nine specific Recovery Actions to address the barred owl threat [many of which] are not yet completed or have not even started." Id. at 25. Second, plaintiffs assert that the final EIS "fail[ed] to take a 'hard look' at the [cumulative] impacts of the Barred Owl Removal Plan" by neglecting to analyze "undisclosed significant impacts to barred [and] spotted owls." Id. at 27-28.

According to FWS, the proposed project, which was designed over a five-year period in consultation with the public and scientists, and which resulted in a 504-page final EIS, adequately

complied with NEPA's procedural mandates.

    A.    <u>Purpose and Need</u>

An EIS "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. "Agencies enjoy considerable discretion to define the purpose and need of a project." <u>Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.</u>, 606 F.3d 1058, 1070 (9th Cir. 2010), <u>cert. denied</u>, 131 S.Ct. 1783 (2011) (citation and internal quotations omitted). The agency need only evaluate alternatives that are "reasonably related to the purposes of the project." <u>Westlands Water Dist. v. U.S. Dep't of Interior</u>, 376 F.3d 853, 868 (9th Cir. 2004) (internal quotation marks omitted). Nonetheless, "an agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality." <u>Nat'l Parks</u>, 606 F.3d at 1070 (citation and internal quotations omitted). Where, as here, "an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS." <u>Westlands Water Dist.</u>, 376 F.3d at 866 (citation omitted).

In this case, the FWS specified that "[t]he purpose of the proposed action is to implement experimental research necessary for conservation of the spotted owl in accordance with Recovery Action 29 of the Recovery Plan." AR 00014. More specifically, "[t]he

Page 10 - OPINION AND ORDER

purpose of the proposed action is to contribute to fulfilling the intent of the [ESA] by rapidly implementing experimental research necessary for conservation of the spotted owl in accordance with Recovery Action 29," which entails:

> (1) obtain[ing] information regarding the effects of barred owls on spotted owl vital rates of occupancy, survival, reproduction, and population trend through experimental removal; (2) determin[ing] the feasibility of removing barred owls from an area and the amount of effort required to maintain reduced barred owl population levels for the duration of the experiment; (3) estimat[ing] the cost of barred owl removal in different forested landscapes; and (4) develop[ing] the information necessary to make a future decision about the management of barred owls as expeditiously as possible.

AR 00121, 00139. Thus, the ESA, the broad objective of which is to conserve threatened or endangered species, informs the proposed action's purpose and need. 16 U.S.C. § 1531(b).

Plaintiffs' allegations of error are flawed for three reasons. First, a recovery plan is "a discretionary document by which scientists determine the methods needed to promote recovery of the species [such that] [i]t is not mandatory that the agency implement [any] suggestions" contained therein. Leatherback Sea Turtle v. Nat'l Marine Fisheries Serv., 1999 WL 33594329, *12 (D.Haw. Oct. 18, 1999) (discussing 16 U.S.C. § 1533(f)); see also Fund for Animals, Inc. v. Rice, 85 F.3d 535, 547 (11th Cir. 1996) ("recovery plans are for guidance purposes only [such that they] breath[e] discretion at every pore"); Friends of Blackwater v. Salazar, 691 F.3d 428, 434 (D.C.Cir. 2012) (recovery "plan is a statement of intention, not a contract"). Accordingly, actions delineated in a recovery plan may occur at different times and be performed by

Page 11 - OPINION AND ORDER

different agencies. 16 U.S.C. § 1533(f); see, e.g., AR 34681.

As plaintiffs repeatedly recognize in their reply brief, FWS is under is no legal obligation to implement any of the suggested actions, much less all of the actions at one time. Pls.' Reply to Mot. Summ. J. 3, 9. Further, plaintiffs do not dispute that each Recovery Action promotes the recovery the species in its own right. See generally Pls.' Mem. in. Supp. of Mot. Summ. J.; Pls.' Reply to Mot. Summ. J. By their very nature, then, the 33 Recovery Actions are not alternatives of one another, but rather separate, independent events that, when utilized collectively, are intended to result in the recovery of a species. Given these circumstances, it would be unreasonable to ask FWS to wait and expand the scope of the proposed project to include other Recovery Actions, especially because doing so would have the practical effect of decelerating the overall conservation process. See AR 34648 ("[i]t is the Service's position that the threat from barred owls is extremely pressing and complex, requiring immediate consideration").

Second, the fact that there are nine other Recovery Actions in the 2011 Recovery Plan that are related to the barred owl does not mean FWS must broaden its purpose and need to include all of these activities. Consistent with the statutory context, FWS' objective is to develop a study to collect data on barred owl and NSO interactions related to barred owl removal, and the purpose and need statement is drafted broadly enough to allow for nine meaningful alternatives while still meeting FWS' objective. AR 00014-18, 00125-26, 00143-79. Plaintiffs' conclusory assertion that

Page 12 - OPINION AND ORDER

FWS' identification of "other actions in the Recovery Plan . . . indicates that they were seen as reasonable," such that they "should have been considered," is simply inadequate to demonstrate that FWS acted in an arbitrary or capricious manner by only examining alternatives related to effectuating Recovery Action 29. See League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv., 689 F.3d 1060, 1072 (9th Cir. 2012) ("[a]lternatives that do not accomplish [the purpose] of the project may properly be rejected as imprudent") (citation and internal quotations omitted). This is especially true in light of the fact that plaintiffs never identify which specific action in the 2011 Recovery Plan would be a reasonable alternative to the proposed project and also "do not take the position that . . . the Recovery Plan dictates FWS' NEPA obligations." Pls.' Reply to Mot. Summ. J. 9-10.

Third, plaintiffs' position ignores the fact that several Recovery Actions are either complete, on-going and represented in the final EIS, or lie outside of FWS' jurisdiction. For example, NSO modeling and expansion of designated NSO critical habitat is complete. AR 34632-33, 34652-53, 34751, 34768-852, 35053-246; 77 Fed. Reg. 71876 (Dec. 4, 2012). The results of Recovery Action 23, which pertains to data analyses "from the demographic study areas relative to the effects of barred owls on spotted owl site occupancy, reproduction, and survival," was incorporated throughout the final EIS. AR 00135-36, 00196, 00199, 00202, 34725. Similarly, Recovery Actions 24 and 26 - the barred owl survey protocol and

partitioning data, respectively - were integrated into the final EIS. AR 00356-57, 00360, 00468, 00470-71, 00477-83, 34725-26. Additionally, while important, Recovery Actions 27 and 31, which relate to public education and outreach, as well as collaboration with private landowners, do not directly advance the conservation of NSOs. AR 34726, 34729. In sum, the record does not reflect that any of the other Recovery Actions related to the barred owl threat are aimed at, or otherwise related to, studying the effects of removal. AR 34724-30.

In light of the purpose of Recovery Action 29, the ESA's underlying preservation goals, and the considerable discretion afforded agencies in this area, the Court finds that the final EIS's purpose and need statement to be reasonable. Moreover, given that there is no dispute that the nine alternative all address barred owl removal, in conjunction with the fact that plaintiffs neglected to identify a viable but unexamined alternative that would satisfy this goal, the Court finds that the final EIS considered a reasonable range of alternatives. FWS' motion is granted and plaintiffs' motion is denied as to this issue.

B.   Hard Look

To accomplish the "hard look" mandate, NEPA requires the agency to provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998), overruled on other grounds by Lands Council, 537 F.3d 981. However, the agency need only address past, present, and future

Page 14 - OPINION AND ORDER

cumulative or indirect impacts that are "reasonably foreseeable."
40 C.F.R. § 1508.7; 40 C.F.R. § 1508.8(b).

Here, the Court finds that FWS provided the requisite
discussion of cumulative impacts. AR 00372-404. Critically, the
effects of the proposed take were fully analyzed in the final EIS.
AR 00249-75. The FWS explained that the preferred alternative would
impact only "0.05 percent of the range of the barred owl in North
America" and plaintiffs have not provided any argument or evidence
to refute or otherwise undermine this statistic. AR 00258; see
generally Pls.' Mem. in Supp. of Mot. Summ. J.; Pls.' Reply to Mot.
Summ. J. FWS also explained why future barred owl removal efforts
did not merit an extensive discussion:

> Options for future management of barred owls are so
> uncertain and broad that we could not attempt to address
> them . . . Because we do not know the feasibility of
> barred owl control as a management tool, because there is
> no proposal to implement any specific barred owl
> management option at this time, and because to try to
> guess what a future proposal for management might be,
> even if feasible, is entirely speculative, future barred
> owl management does not represent a cumulative effect
> (reasonably foreseeable future action) for this Final
> EIS. If a decision is made to manage barred owl
> populations in the future, implementation would be
> preceded by completion of any necessary legal
> requirements, including compliance with NEPA.

AR 00138. Accordingly, FWS determined that future actions resulting
in the take of barred owls had not yet been proposed and were
therefore too speculative to be considered a cumulative impact.[2]

---

[2] For this reason, plaintiffs' assertion, for the first time
in their reply, that FWS "failed to consider future management
implications" because "it is not feasible to perpetually shoot
all competing birds across the entire Pacific Northwest," is
unavailing. Pls.' Reply to Mot. Summ. J. 11; see also Lentini v.
Cal. Ctr. for the Arts, Escondido, 370 F.3d 837, 843 n.6 (9th

See Jones v. Nat'l Marine Fisheries Serv., 741 F.3d 989, 1000 (9th Cir. 2013) ("[f]or any project that is not yet proposed, and is more remote in time[,] a cumulative effects analysis would be both speculative and premature") (citation and internal quotations omitted).

Plaintiffs ignore this analysis and instead cite to a researcher's comment about general raptor mortality rates caused by other human factors, such as vehicles and wind turbines. Pls.' Mem. in Supp. of Mot. Summ. J. 28 (citing AR 09242). This statement, however, says nothing specific to forest owls, much less barred owls, and is not instructive as to any potential future significant increase in relevant mortality rates. In fact, barred owls appear to be thriving. See AR 00250 ("barred owl populations and distribution have greatly increased, to the point where populations may be saturated in Washington and coastal Oregon"), 00253 ("[b]arred owls may even exceed the carrying capacity of their habitat and prey base due to their rapid rate of population growth").

Likewise, FWS did not overlook any reasonably foreseeable indirect effects to the NSO; plaintiffs rely on an email chain between Dr. David Wiens and FWS' primary biologist in support of

Cir. 2004) (courts need not consider arguments first raised in a reply brief). Indeed, the final EIS is not proposing to indefinitely and completely remove barred owls from the NSOs' range, and FWS reiterates in these proceedings that any future barred owl management strategy, which "may, or may not, include removal as a tool," would have to "undergo further environmental analyses, including NEPA." FWS' Reply to Cross-Mot. Summ. J. 17 n.7.

their argument. Pls.' Mem. in Supp. of Mot. Summ. J. 29 (citing AR 09529-31). As a threshold matter, plaintiffs did not raise this issue during the administrative process, such that it cannot be brought before this Court. Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764-65 (2004). Although FWS expressly noted this deficiency in their opening brief, plaintiffs failed to respond. See Bojorquez v. Wells Fargo Bank, NA, 2013 WL 6055258, *5 (D.Or. Nov. 7, 2013) ("[i]f a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded") (citation and internal quotations and brackets omitted).

Regardless, even assuming that plaintiffs properly preserved this issue, the record demonstrates that FWS affirmatively and independently solicited advice on this possible indirect effect and reasonably found it too speculative for further analysis. AR 09532-33. In response to FWS' inquiry, Dr. Wiens remarked there may be areas in which barred owls and NSOs have reached an equilibrium and that removing barred owls from such areas may be adverse to NSOs. AR 09530-31. FWS followed-up by posing additional questions to Dr. Wiens, explaining that it was trying to determine if this possible indirect effect was reasonably certain to occur. AR 09530-32. During this exchange, FWS also observed that NSO populations continue to decline, which indicated that the equilibrium postulated by Dr. Wiens does not exist. AR 09527. Dr. Wiens replied by clarifying that his opinion was merely a hypothesis, describing this possible indirect effect as "just a thought." Id.; see also AR

Page 17 - OPINION AND ORDER

09530 (Dr. Wiens articulating "[t]he likelihood of this effect [as] unknown"). He also specified: "I think it would be naive to assume that some NSO are not capable of adapting to the presence of BO, and my point is that the experiment could disrupt this adaptive process" but "I did not mean to imply that NSO are successfully reproducing and maintaining stable populations over the long-term in these situations." AR 09527.

After a supplemental investigation, including consultation with another researcher, Dr. Lowell Diller, FWS determined that indirect effects from Dr. Wiens' social strife hypothesis were too speculative to analyze in the final EIS:

> Some have suggested that if the control area is in close proximity to treatment area, there is the slight possibility that effects of removal may influence barred owl population dynamics or behavior in the portions of the control area immediately adjacent to the treatment. At this time, there is no research or data that support this hypothesis. However, we will be able to detect these effects if they occur.

AR 00297, 03189; see also Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy, 383 F.3d 1082, 1090 (9th Cir. 2004) ("[a]n EIS need not discuss remote and highly speculative consequences") (citation and internal quotations omitted).[3] Nevertheless, FWS evaluated what would it thought would happen after the removal

_____

[3] To the extent plaintiffs contend the final EIS should have discussed "another experiment with two bird species, where removal of the more territorial species, red-bellied woodpeckers, negatively affected red-cockaded woodpeckers," their argument is unpersuasive. Pls.' Mem. in Supp. of Mot. Summ. J. 29-30. This study was considered by FWS; it was partially the basis for Dr. Wiens' hypothesis. AR 03198. Regardless, this study involved an entirely discrete bird species, in a different habitat, such that it is not informative as to any reasonably foreseeable impact on the proposed action. Id.

Page 18 - OPINION AND ORDER

study was concluded, finding that "barred owl populations on the treatment areas would likely return to pre-removal levels" within five years or less. AR 00255, 00372.

Thus, FWS did not ignore this issue; instead, agency staff diligently sought out the best possible advice and made a reasoned factual determination based on their scientific expertise. Additionally, the final EIS makes clear that any adverse impacts to NSOs due to the removal study will be closely monitored. The Court must defer to FWS' conclusions because they "are supported by studies that the agency deem[ed] reliable." Native Ecosys. Council v. Weldon, 697 F.3d 1043, 1053 (9th Cir. 2012) (citation and internal quotations omitted); see also Lands Council, 537 F.3d at 993 (court must "defer to an agency's determination in an area involving a high level of technical expertise" and "be most deferential when the agency is making predictions, within its area of special expertise, at the frontiers of science") (citations and internal quotations and brackets omitted). FWS' motion is granted and plaintiffs' motion is denied as to plaintiffs' NEPA claims.

II.   MBTA Claim

The MBTA makes it unlawful "to pursue, hunt, take, capture [or] kill" any migratory bird "[u]nless and except as permitted by regulations" issued by the Secretary of the Interior ("Secretary"). 16 U.S.C. § 703(a). The MBTA thus directs the Secretary to determine "when [and] to what extent, if at all, and by what means,

it is compatible with the terms of the conventions[4] to allow
hunting, taking, capture, killing . . . of any [migratory] bird [in
the United States] and to adopt suitable regulations permitting and
governing the same." 16 U.S.C. §§ 701, 704(a).

FWS implements the MBTA on behalf of the Secretary and has
issued regulations in accordance with 16 U.S.C. § 704. 50 C.F.R. §
10.1. These regulations allow FWS, in relevant part, to distribute
permits for the take of migratory birds "for scientific research or
educational purposes" if the regulatory criteria are met. 50 C.F.R.
§ 21.23. Where such a permit is issued, the take of migratory birds
is exempted from criminal prosecution. Id.

Initially, it is undisputed that FWS' implementing
regulations, including 50 C.F.R. § 21.23, were promulgated through
the proper rulemaking process. It is also undisputed that FWS
complied with all the regulatory requirements described in 50
C.F.R. § 21.23 when issuing the permit.

Plaintiffs argue that FWS violated the MBTA because, "when the
Secretary permits take for scientific purposes, the action must be
intended to advance the conservation of the very species being
taken" as "[a]ny other interpretation would fail to give effect to
the very fact that the Conventions' purposes are to conserve and
protect specific birds." Pls.' Mem. in Supp. of Mot. Summ. J. 15.

---

[4] In 1916, in order to create a uniform system for migratory
birds that regularly cross national boundaries, the United States
negotiated a treaty with the United Kingdom, acting on behalf of
Canada; analogous treaties were later entered into with Mexico,
Japan, and the Soviet Union. AR 00141. The MBTA implements these
bilateral treaties, referred herein collectively as the
"conventions." Id.

Conversely, FWS asserts that plaintiffs' position "ignores the plain language of the MBTA and FWS' implementing regulations," all of which "were designed to limit and manage the take of migratory birds through regulation, while allowing responsible harvest for multiple purposes including science, sport, and industry." Def.'s Mem. in Supp. of Cross-Mot. Summ. J. 15.

The Court agrees with FWS. An independent review of the conventions and the MBTA reveals that nothing therein requires the issuance of a permit to advance the species being taken. See McDaniel v. Wells Fargo Invs., LLC, 717 F.3d 668, 677 (9th Cir. 2013) ("[u]nder the standard rules of statutory construction, [the court] will not read into the statute [language] that is not there") (citations and internal quotations omitted). Congress knows how to create an affirmative duty to preserve a particular species; it elected not to do so here. See, e.g., 16 U.S.C. § 1532. Significantly, plaintiffs do not cite to a single source of law in support of the proposition that "a person seeking a scientific collecting permit must demonstrate that the purpose of the permit will possibly lead to scientific information that could aid in the conservation or protection of the species being collected." Pls.' Mem. in Supp. of Mot. Summ. J. 16.

This is likely because both the MBTA and the Mexico Convention[5] allow for much greater flexibility than plaintiffs'

---

[5] As FWS notes, and plaintiffs do not dispute, "only the Mexico Convention protects Barred Owls." FWS' Mem. in Supp. of Cross-Mot. Summ. J. 18 n.4 (citation omitted); Pls.' Reply to Mot. Summ. J. 5 n.6. Accordingly, outside the MBTA and its implementing regulations, the Mexico Convention is the only

suggest. The explicit text of the Mexico Convention, as well as the
MBTA and its implementing regulations, acknowledge many different
"purposes" - including scientific research - especially where there
is no indication that the authorized action would imperil, or even
meaningfully effect, the overall population of species being
taken.[6] 16 U.S.C. §§ 701, 704(a); 50 C.F.R. §§ 21.11, 21.23, 21.27,
21.41; AR 00141, 35782; see also Mexico Convention, 50 Stat. 1311,
Preamble & Arts. I-II (Feb. 7, 1936) ("it is right and proper to
protect said migratory birds [in] order that the species may not be
exterminated . . . for this purpose it is necessary to employ
adequate measures which will permit a rational utilization of
migratory birds for the purpose of sport as well as for food,
commerce and industry," such that a take is allowed, "with
appropriate authorization, from private game farms or when used for
scientific purposes, for propagation or for museums"). Indeed, the

---

treaty that guides this Court's inquiry. See Fund for Animals v.
Norton, 365 F.Supp.2d 394, 411 (S.D.N.Y. 2005), aff'd, 538 F.3d
124 (2nd Cir. 2008) (courts need only analyze the proposed action
for compliance pursuant to the treaty or treaties that explicitly
govern the disputed bird species); see also Alaska Fish &
Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle, 829 F.2d 933,
941 (9th Cir. 1987), cert. denied, 485 U.S. 988 (1988) (assessing
the proposed action under all four conventions because "all
treaties protect the migratory birds [at issue]"). Nevertheless,
as both parties acknowledge, similar to the Mexico Convention,
the three remaining treaties allow the take of migratory birds
for scientific or educational purposes, where that take is
compatible with the terms of the conventions.

[6] As summarized herein, barred owls are now wide-spread
throughout much of the United States and Canada, and have never
been contemplated for listing under the ESA. As such, plaintiffs
do not dispute that the proposed action will not place this
species at risk of extinction or otherwise negatively impact
their continued existence. See generally Pls.' Mem. in Supp. of
Mot. Summ. J.; Pls.' Reply to Mot. Summ. J.

Canada Convention, on which plaintiffs most heavily rely, defines its "conservation principles" as follows: "To manage migratory birds internationally; To ensure a variety of sustainable uses; To sustain healthy migratory bird populations for harvesting needs; To provide for and protect habitat necessary for the conservation of the migratory birds; and To restore depleted populations of migratory birds." Canada Convention, 39 Stat. 1702, Art. II (Dec. 8, 1916).

In other words, instead of mandating that the Secretary issue scientific collecting permits solely for the protection of any listed species, "the MBTA requires federal management of the migratory bird population to weigh [the] factors [articulated in 16 U.S.C. § 704(a), which predominately relate to the incidence of the bird being taken,] when exercising authority." Fund for Animals, 365 F.Supp.2d at 419-20. Plaintiffs implicitly acknowledge as much. See Pls.' Reply to Mot. Summ. J. 2 ("the real purpose of the Conventions [is] to conserve species that might otherwise be at risk of extinction - with the exceptions acknowledged within these treaties to permit limited and managed takes for defined purposes"). Although limited, cases that have examined this issue either directly or by analogy have rejected plaintiffs' position. See Turtle Island Restoration Network v. U.S. Dep't of Commerce, 2013 WL 4511314, *9 (D.Haw. Aug. 23, 2013) (rejecting the plaintiff's assertion that any take permit issued under the MBTA "must promote bird conservation"); Fund for Animals, 365 F.Supp.2d at 419-20 (rejecting the plaintiffs' contention that the MBTA

Page 23 - OPINION AND ORDER

"hold[s] FWS to a standard requiring it to be as protective as possible of a protected bird species"); see also Humane Soc'y of the U.S. v. Watt, 551 F.Supp. 1310, 1319 (D.D.C. 1982), aff'd, 713 F.2d 865 (D.C.Cir. 1983) ("the MBTA does not impose upon the [agency] a mandatory duty to prohibit the hunting of any species whose population, for whatever reason, is declining").

Further, plaintiffs' interpretation is not in accord with the MBTA's overall statutory scheme. Namely, the MBTA authorizes the killing of migratory birds for food and/or sport, which does not have any direct conservation benefit for the species that is being hunted. 50 C.F.R. § 20.100; Mexico Convention, 50 Stat. 1311, Arts. I-II (Feb. 7, 1936). Likewise, the MBTA allows the permitted take of migratory birds that are destroying crops. 50 C.F.R. §§ 21.41-46; Mexico Convention, 50 Stat. 1311, Art. II (Feb. 7, 1936). While it is undisputed that the MBTA does not speak directly to the taking of one migratory bird for the benefit of another, more endangered migratory bird, the Court finds that FWS' proposed action is compatible with both the express language and the overall context of the conventions and the MBTA. See The Wilderness Soc'y v. U.S. Fish & Wildlife Serv., 353 F.3d 1051, 1060 (9th Cir. 2003) (as amended) ("the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"); see also 16 U.S.C. § 1531(a)(4) (under the ESA, "the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to [the

Page 24 - OPINION AND ORDER

conventions]").[7]

Regardless, even accepting plaintiffs' argument, FWS expressly found that the authorized take would have the primary effect of advancing the scientific understanding and conservation of NSOs, with the subordinate impact of aiding in the scientific understanding of barred owls. AR 00013-18, 00120-22, 35780-83. While plaintiffs disagree concerning whether "the experiment as constructed" will advance FWS' understanding of either species, the fact remains that FWS' decision is supported by a plethora of evidence.[8] Pls.' Mem. in Supp. of Mot. Summ. J. 17-18. In fact, the

---

[7] Plaintiffs' reliance on Executive Order 13186 does not alter this Court's analysis. As several other courts have observed, that order, by its own express terms, "is intended only to improve the internal management of the executive branch and does not create any right or benefit, substantive or procedural, separately enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person." Friends of Animals v. Clay, 2014 WL 4966122, *9 (E.D.N.Y. Oct. 3, 2014) (citations and internal quotations omitted).

[8] Plaintiffs do not dispute that the study was designed to advance the scientific knowledge of both barred owls and NSOs. See generally Pls.' Mem. in Supp. of Mot. Summ. J.; Pls.' Reply to Mot. Summ. J. They nonetheless attack the proposed action's likelihood of success because three researchers questioned the utility of the study on the basis that it would merely "confirm what we already know about the benefit of removing barred owls from NSO habitat," other researchers found that the final EIS lacked a "clear articulation of feasible management options," and Dr. Wiens "raised concerns that the experiment will end up having a negative effect on the NSO." Pls.' Mem. in Supp. of Mot. Summ. J. 17-18 (citing AR 03952, 09530, 14433) (internal quotations omitted). However, as FWS notes, the researchers cited by plaintiffs "never explained how" the agency "should have developed 'feasible management options' before implementing Recovery Action 29." FWS Mem. in Supp. of Cross-Mot. Summ. J. 25. Given that the whole purpose of the study is to gather information relating to whether removal could reasonably be used as a tool for managing barred owl competition with threatened NSOs, it is difficult to see what additional considerations the

Page 25 - OPINION AND ORDER

record is replete with documentation explaining how the implementation of Recovery Action 29 furthers a scientific purpose and promotes conservation of the NSO. See, e.g., AR 00013-18, 00120-21, 00130, 00249-75, 00324, 00562-63, 01405-21, 03189, 35780-83; see also Trout Unlimited v. Lohn, 559 F.3d 946, 959 (9th Cir. 2009) (agency's judgments regarding "conflicting scientific evidence . . . are entitled to particularly deferential review") (citations omitted); Nat'l Wildlife Fed'n, 384 F.3d at 1174 ("[w]here scientific and technical expertise is necessarily involved in agency decision-making, especially in the context of prediction[,] the Supreme Court has held that a reviewing court must be highly deferential to the judgment of the agency") (citation omitted). Finally, contrary to plaintiffs' assertion, the proposed study is consistent with FWS' previous permitting practices. AR 01429-30, 01433-34, 01466; FWS' Mem. in Supp. of Cross-Mot. Summ. J. Exs. 1-3; see also Humane Soc'y of U.S. v. Bryson, 924 F.Supp.2d 1228, 1236-53 (D.Or.), aff'd, 548 Fed.Appx. 355 (9th Cir. 2013) (affirming the agency's decision authorizing the take of sea lions pursuant to the Marine Mammal Protection Act for the protection of salmonid species, which are listed under the ESA).

    In sum, current research reflects that, when barred owls

---

FWS should have undertaken. See id. ("[r]equiring FWS to know the results before conducting the study defeats the very notion of scientific research"). In any event, study results will be used to identify future feasible management options. AR 00562-63. As addressed in section I(B), Dr. Wiens' hypothesis is not dispositive in this context.

invade NSO habitat, the NSO is usually forced out of that location resulting in decreased survival. To gauge the extent of this threat, FWS spent over five years designing a study - which resulted in a 433-page draft EIS, notice and an opportunity for public comment on FWS' alternatives, a 504-page final EIS refining nine different alternatives and responding to public comments, and a ROD and permit issued under the MBTA - that will provide information on the interaction between these species and yield data on whether a long-term management program could be successful in conserving the NSO. Therefore, having undertaken a thorough review of the record, the Court finds that FWS pursued an exhaustive inquiry and articulated a rational basis, supported by facts, for the proposed action.[9] In acknowledging certain gaps in known research concerning the interplay between barred owl and NSO populations, the FWS did not render its final conclusion arbitrary and capricious, but rather indicated an intention to readjust its management strategy after the permit went into effect. FWS' motion is granted and plaintiffs' motion is denied.

### CONCLUSION

Plaintiffs' motion for summary judgment (doc. 23) is DENIED. Defendant's cross-motion for summary judgment (doc. 24) is GRANTED.

---

[9] Neither party takes a clear position regarding the analytical framework that applies to the issuance of a permit under the MBTA, instead alternatively assessing FWS' conduct pursuant to <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984); <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944); <u>Auer v. Robbins</u>, 519 U.S. 452 (1997); <u>United States v. Mead Corp.</u>, 533 U.S. 218 (2001); etc. The Court need not resolve this issue as, irrespective of which standard governs, the proposed action passes muster.

Page 27 - OPINION AND ORDER

As such, the parties' requests for oral argument are DENIED as unnecessary. This case is DISMISSED.

IT IS SO ORDERED.

Dated this 16th of July 2015.

_____
Ann Aiken
United States District Judge